IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF WISCONSIN

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

DANIEL CORREA-OSORIO,

      Plaintiff,

  -vs-                              Case No. 21CV235

ELITE FINISHING, LLC,

      Defendant.

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = =


Remote Videoconference Deposition of:

JAIME J. MALISZEWSKI

September 28, 2021

Reported by:  Taunia Northouse, RDR, CRR, CRC

```
 1                    I N D E X

 2   WITNESS                                 Page(s)

 3   JAIME J. MALISZEWSKI

 4             Examination by Mr. Arellano         6

 5             Examination by Mr. Seneczko        45

 6

 7

 8                  E X H I B I T S

 9   No.    Description                      Identified

10

11

12             (There were no exhibits marked
                for identification)
13

14

15

16             REQUESTS                         Page

17
     1    Name of the Elite Finishing employees    11
18

19

20

21

22   (Original transcript filed with Attorney Arellano,
      copies provided to both counsel)

23

24

25
```

1              REMOTE VIDEOCONFERENCE DEPOSITION of

2     JAIME MALISZEWSKI, a witness of lawful age, taken on

3     behalf of the Plaintiff, wherein Daniel Correa-Osorio

4     is Plaintiff, and Elite Finishing, LLC, is Defendant,

5     pending in the United States District Court for the

6     Eastern District of Wisconsin, pursuant to notice,

7     before Taunia Northouse, a Registered Diplomate

8     Reporter and Notary Public in and for the State of

9     Wisconsin, on the 28th day of September 2021,

10    commencing at 11:04 in the forenoon.

11

12                A P P E A R A N C E S

13       (All appearances by remote Zoom videoconference)

14
      VICTOR M. ARELLANO, Esquire
15    ARELLANO & PHEBUS, S.C.
         1468 North High Point Road, Suite 102, Middleton,
16       Wisconsin 53562, appearing on behalf of the
         Plaintiff.
17            varellano@aplawoffice.com  608-827-7680

18
      ALAN E. SENECZKO, Esquire
19    WESSELS SHERMAN JOERG LISZKA LAVERTY SENECZKO, PC
         1860 Executive Drive, Suite E-1, Oconomowoc,
20       Wisconsin 53066, appearing on behalf of the
         Defendant.
21            alseneczko@wesselssherman.com  262-560-9696

22
      Also present:     Daniel Correa-Osorio,
23                      Olivia Ruckstuhl, and Mayra Ceballos

24

25

1          MR. ARELLANO:  Good morning.  This

2      is Attorney Victor Arellano, attorney for the

3      plaintiff, Daniel Correa-Osorio, who is also

4      present.  And also present are two of my

5      paralegals, Olivia and Mayra.

6          Counsel, I have been thinking about

7      calling you and asking you -- unless you've

8      already done it, but I wanted to make sure I

9      put it on the record.  You provided a

10     supplemental response to Complainant's First

11     Request for Production of Documents.  And the

12     response that I have with me contains three

13     pages; one of which includes your signature,

14     and the third page is blank.  Apparently

15     Ms. Hasan did not sign this document.  Would

16     you please make a point to have Ms. Hasan

17     sign this document and send it?

18          MR. SENECZKO:  What is it?  The

19     Supplemental Response, Victor?

20          MR. ARELLANO:  Yes.  It's the

21     Supplemental Response to Complainant's First

22     Request for Production of Documents.

23          MR. SENECZKO:  Okay.  But the one

24     that I have Jaime signed; right?  Do you have

25     that?

1          MR. ARELLANO:  I don't have that

2     one.  And I just wanted to make sure that we

3     both -- we all are on the same page.

4          MR. SENECZKO:  Yeah.  Well, we

5     sent --

6          MR. ARELLANO:  Do we have that on

7     file, Olivia?

8          MS. RUCKSTUHL:  Yeah.  That should

9     be in the binder.

10          MR. SENECZKO:  Yeah.  I do have one

11     signed by Atiya.  So I can just email that to

12     Olivia right now.

13          MR. ARELLANO:  Perfect.  I

14     represent to you and to Olivia that the one

15     that I have in my binder is only signed by

16     you.

17          MR. SENECZKO:  Yeah.  Olivia, I

18     just sent that over there.

19          MS. RUCKSTUHL:  Perfect.  Thank

20     you.

21          MR. ARELLANO:  Okay.  Now you may

22     proceed, Madame Reporter.

23

24

25

1                    JAIME J. MALISZEWSKI,

2          called as a witness, being first duly sworn,

3          testified on oath as follows:

4

5                         EXAMINATION

6    By Mr. Arellano:

7    Q   Good morning, sir.  Could you state your full name

8        and address for the record.

9    A   Jaime John Maliszewski, 9720 West St. Stephens

10       Drive, Franklin, Wisconsin 53132.

11   Q   Have you ever given testimony in a deposition

12       before today?

13   A   Yes.

14   Q   How many times?

15   A   I believe twice.

16   Q   When was the last time that you gave testimony in

17       a legal proceeding?

18   A   I don't remember the date.

19   Q   What was the year?

20   A   I believe maybe 2015 or '16.

21   Q   And when was the other time when you provided

22       legal testimony in any legal proceeding?

23   A   I can't remember the dates or time.

24   Q   What year?

25   A   Can't remember the year.

1   Q   How old are you?

2   A   57.

3   Q   Any reason why you don't remember?

4   A   It was a long time ago, and I don't remember.

5   Q   Are you under any kind of medication today that

6       may inhibit or impair your ability to recall, to

7       understand, speak?

8   A   No.

9   Q   All right.  What's your education?

10  A   I have a BS in marketing and management.

11  Q   Where did you go to school?

12  A   University of Stevens Point-Wisconsin.

13  Q   Other than UW-Stevens Point, have you attended any

14      other academic institution?

15  A   I went to Thomas More High School.  I went to

16      St. Charles Borremeo Grade School and St. Roman's

17      Grade School.  And I also was at Cooper Elementary

18      for kindergarten.

19  Q   Where are these three schools located?

20  A   St. Roman's and St. Charles are both in Milwaukee,

21      Wisconsin, as is Cooper Elementary.

22          St. Thomas More is in St. Francis, Wisconsin.

23  Q   Are you originally from Milwaukee?

24  A   Yes.

25  Q   What's your occupation?



1  A   I am president of Reliable Plating and general

2      manager of Elite Finishing, LLC.

3  Q   Are you a hundred percent owner of the company?

4  A   No.

5  Q   Who else owns any interest in this company?

6  A   Jeffrey Maliszewski.

7  Q   Who is he?

8  A   My brother.

9  Q   For how long have you owned this company?

10             MR. SENECZKO:  Your Honor -- just

11         so the record is clear, can you specify which

12         company you're talking about or both?

13             MR. ARELLANO:  Well, that's a good

14         request for clarification.

15 Q   Are we talking about two different companies, sir?

16             MR. ARELLANO:  Thank you, Counsel.

17 A   Yes.  That's why they have two names.

18 Q   Thank you.  Let's talk about the first one,

19     Elite Finishing.  Who owns Elite Finishing?

20 A   Jeff Maliszewski and myself.

21 Q   And the other company that you mentioned, what's

22     the name again?

23 A   Reliable Plating Works, Incorporated.

24 Q   Who owns that second company?

25 A   Jeff Maliszewski and myself.

```
1    Q   For how long have you owned these two companies,

2        you and your brother?

3    A   I have been owner of Elite Finishing since

4        September of 2001, and I have been owner of

5        Reliable since 1998.

6    Q   And with respect to Elite Finishing, what role do

7        you play as far as the operation is concerned?

8    A   General manager.

9    Q   And have you been the general manager since

10       September 2001?

11   A   No.

12   Q   Since when?

13   A   I believe it was 2005 that I took that position.

14   Q   And as a general manager, can you describe what

15       your duties and responsibilities are as best as

16       you can?

17   A   My duties are to oversee the overall well-being of

18       the company.  So I have the plant manager report

19       to me as well as the department heads.

20   Q   And with respect to Elite Finishing, how many

21       employees work in this company, including you?

22   A   We have nine employees, and we have approximately

23       25 temporary help.

24   Q   What about the second company?  How many employees

25       do you have in that company?
```

1   A   Is that relevant to this case?

2   Q   Well, your lawyer will let you know that.  I will

3       tell you how things will be run.  You notice that

4       we have a court reporter.  She wants to make sure

5       that I don't interrupt you, that you don't

6       interrupt me.  And when counsel wants to say

7       something, you and I should not interrupt him.

8           No. 2, if you don't understand my question,

9       please let me know so that the court reporter can

10      play it back for you or I can modify the question.

11      When you answer, make sure you answer in the

12      affirmative, negative, or tell us "I don't

13      remember, I don't know" instead of making noises

14      or nodding of your head.

15          So far I have asked you questions for the

16      last ten minutes.  You have given me answers.  I

17      suspect you understood each question; is that

18      correct?

19  A   Yes.

20  Q   And, of course, you know that you are providing

21      testimony under oath and subject to perjury; do

22      you understand that?

23  A   Yes.

24  Q   And, of course, if there are any objections to the

25      type of question or how the question should be

1       done or phrased, you have a very competent

2       attorney that will let you know.  And I suspect

3       when he doesn't do that it's because he

4       understands that things are flowing so far so

5       good.  It's the job of the attorney to raise those

6       objections.  It is not the position of a witness

7       to engage in either arguments or debates.  Under

8       the discovery rules we are given some flexibility.

9       But yeah, there are times when we've got to be

10      careful.

11          Did you understand my explanation?

12  A   Yes.

13  Q   Okay.  Thank you.

14              MR. ARELLANO:  Madame Reporter, can

15          you read the last question for the witness,

16          subject to his concerns.

17              (Question read)

18  A   We have 38 employees and approximately 22 or 23

19      temporaries.

20  Q   With respect to Elite Finishing, you mentioned

21      that you have nine full-time employees.  Who are

22      they?

23  A   We have Rich Ivilus, Greg Mallum.

24          Boy, I'm trying to think through all the

25      names here.  I've got a lot of people I deal with.

```
 1        I can't remember all the names initially.  If
 2        you'd like, I could get a list and I could read it
 3        to you.  But offhand, I'd have a hard time getting
 4        all the names together for you right now.
 5   Q    Just give them to your attorney.  You can do that.
 6             You also mentioned that there are department
 7        heads.  I think that was the term that you used.
 8        Did I understand that correctly?
 9   A    Yes.
10   Q    How many departments are there within
11        Elite Finishing?
12   A    Two.
13   Q    What departments are you talking about?
14   A    Polishing and plating.
15   Q    Any other section just not part of these two
16        departments?
17   A    No.
18   Q    All right.  And who is the department head of
19        polishing?
20   A    Rich Ivilus.
21   Q    Do you mean A-V-A-L-O-S, Avalos?
22   A    No.
23   Q    Okay.  Do you know how to spell the last name?
24   A    I believe it is I-V-U-L-I-S.
25   Q    And what about, who is the department of
```

```
 1        polishing -- I'm sorry.  There are two
 2        departments.  Who is the other head?
 3   A    That would be Jose Lopez.
 4   Q    Tell me about Jose Lopez's department.  What's the
 5        nature of that department?
 6   A    That department handles the application of copper,
 7        nickel, and chrome coatings onto our customers'
 8        products.
 9   Q    And how many employees do you have under
10        Jose Lopez?
11   A    I would have to look at a sheet to give you that
12        information.
13   Q    Just give me a rough estimate given the number of
14        years that you owned that company.
15   A    I would say around 20, 22 maybe total between the
16        temporaries and the full-time.
17   Q    And other than Jose Lopez for his particular
18        department, are there any other supervisors other
19        than Jose Lopez?
20   A    There's a night supervisor, yes.
21   Q    Who is that?
22   A    Currently it's Victor.
23   Q    Victor what?
24   A    I can't think of his last name right now.
25   Q    Is that Victor Orozco?
```

```
 1    A    Yes.
 2    Q    Where did Victor Orozco work before he became a
 3         supervisor of the night sift?
 4    A    He still works as a waste treatment operator.
 5    Q    And who does the -- as I understand there are two
 6         shifts for the waste treatment department; is that
 7         correct?
 8    A    No.
 9    Q    There's only one?
10    A    That's what "no" means, yes.
11    Q    Thank you.  So Victor Orozco is the only person
12         working for that department, the waste treatment?
13    A    It's not a department, but yes, he does work in
14         the waste treatment, yes.
15    Q    Waste treatment operates all day long, including
16         the evening?
17    A    No.
18    Q    How many hours is that particular unit in
19         operation?
20    A    About 10 to 12 hours a day.
21    Q    Okay.  And Victor Orozco is the only one working
22         in that department --
23    A    Correct.
24    Q    -- or unit or location?
25    A    Correct.
```



1  Q  Have you ever had more than one person working at

2     the waste treatment unit?

3  A  Yes.

4  Q  Who was it?

5  A  Your client.

6  Q  What's his name?

7  A  Mr. Correa.

8  Q  Daniel Correa-Osorio; is that right?

9  A  Yes.

10 Q  When did Mr. Correa-Osorio work for the waste

11    treatment unit?

12 A  I don't keep dates in my head.  Sorry.

13 Q  Do you remember the year?

14 A  No.

15 Q  Do you remember for how long he worked for that

16    unit?

17 A  No, I do not.

18 Q  Is your office located in the same location where

19    Elite Finishing company is located?

20 A  No.

21 Q  Where is your office located?

22 A  5230 South 13th Street, Milwaukee, Wisconsin.

23 Q  For how long have you operated out of that

24    location?

25 A  Since 1998.



1   Q   All right.  And other than Jose Lopez, do you have
2       any other plant managers working for
3       Elite Finishing?
4   A   No.
5   Q   You mentioned that there are two departments and
6       one is run by Rich Ivilus, and the other one would
7       be Jose Lopez; is that correct?
8   A   Yes.
9   Q   Do you have a human resources person working
10      within Elite Finishing?
11  A   No.  She works at Reliable.
12  Q   Okay.
13  A   And covers Elite as well.
14  Q   What's the name of this person?
15  A   Atiya Hasan.
16  Q   How long has Atiya Hasan been an employee of your
17      company?
18  A   About 20 years.
19  Q   Who hired her?
20  A   I did.
21  Q   Okay.  What's her function or functions?
22  A   She handles our HR, but she also handles our
23      customer relations as it relates to deliveries.
24  Q   Before coming here today, did you review any
25      documents related to this case?

1   A   I looked at our information that we've had from

2       previous conversations with you or interactions

3       with you, yes.

4   Q   What information did you review?

5   A   Our interrogatory responses that we had to prepare

6       for you, the stuff that we had to put together.

7       Anything that we've had to prepare for you, I

8       looked over what we prepared for you.

9   Q   So I suspect you read the complaint that was filed

10      by Mr. Correa against Elite Finishing; is that

11      correct?

12  A   Yes.

13  Q   And you had to prepare answers to discovery that

14      was submitted by Daniel Correa's counsel; is that

15      correct?

16  A   Yes.

17  Q   Do you recall helping to provide answers to

18      plaintiff's interrogatories?

19  A   Again repeat.  I don't understand what you're

20      asking.  I think that's the same question, isn't

21      it?

22  Q   Well, then you probably did understand.  But I'll

23      ask you again.  Did you provide -- did you help to

24      provide answers to Plaintiff's First Set of

25      Interrogatories?

1  A   Yes.  I believe that's the same answer I just gave

2      you on a previous question.

3  Q   All right.  And did you read the answers before

4      you signed the signature page?

5  A   Yes.

6  Q   Did you help to provide a response to our request

7      for records?

8  A   Yes.

9  Q   Other than you and counsel, did anyone else assist

10     in the responding of the interrogatories, other

11     than you and counsel?

12 A   Yes.

13 Q   Who was it?

14 A   Atiya Hasan.

15 Q   Anyone else?

16 A   Not that I know of.

17 Q   All right.  Going back to your role as the general

18     manager, with respect to Elite Finishing, do you

19     get involved in the hiring and/or firing of

20     employees?

21 A   Yes.

22 Q   Do you get involved in the -- any disciplinary

23     action given to employees?

24 A   What do you mean do I get involved?

25 Q   Do you approve, disapprove, sign in any way?

1   A   I am made aware of things that are going on as far

2       as disciplinary actions.  And I at times will give

3       advice as to where I think we need to go with

4       those disciplinary actions.

5   Q   With respect to Daniel Correa-Osorio, while he was

6       employed for Elite Finishing, do you recall ever

7       issuing any disciplinary action of any kind while

8       he was an employee?

9   A   Are you asking if I personally did or the company

10      did?

11  Q   Let's talk about you.

12  A   I personally did not submit a disciplinary action

13      with him other than --

14  Q   Go ahead.

15  A   -- other than making a final decision to end our

16      employment with him after a disciplinary meeting

17      was put in place between Atiya Hasan and

18      Mr. Correa.

19  Q   How did you learn of such meeting?

20  A   I was made aware that there was a meeting to take

21      place between -- or with Mr. Correa to explain to

22      him some issues that were happening with him and

23      that we needed to have corrected.  I believe it

24      was a day or the day of the meeting that I was

25      made aware of that.

1   Q   And you did testify that you made a decision to

2       terminate his employment.  Did I understand that

3       correctly?

4   A   That was my decision and my decision alone, yes.

5   Q   Before the meeting that you are referring to which

6       led you to terminate his employment, do you recall

7       having any issues with the conduct and/or

8       performance of Mr. Daniel Correa-Osorio as an

9       employee of the company?

10  A   Yeah.  I had heard of some things that were

11      happening that they were trying to get corrected,

12      yes.

13  Q   What did you hear before the alleged meeting?

14  A   There were some times -- I was made aware times

15      before where he has some overfills of tanks.  He

16      had some issues with making bad chemical adds that

17      caused a very bad fume in the facility because of

18      misuse of chemistry.  And there was also -- we

19      found out closer to that meeting, that I found out

20      that he was leaving the facility without letting

21      people know and without punching out and punching

22      back in for extended periods of time.

23  Q   And you learned of these allegations before the

24      meeting, which prompted you to terminate him; is

25      that right?

1    A    No. That's not why.

2    Q    Did you understand my question, sir?

3    A    Yeah. Did you understand my answer?

4    Q    No, not really.

5              MR. ARELLANO: Let me ask the court

6        reporter to read the question.

7          (Previous question read)

8    A    And I answered, no, it was not.

9    Q    Okay. So what specific allegations you knew of

10      before the meeting took place between Ms. Hasan

11      and Mr. Correa?

12    A    Repeat yourself again, please.

13           (Question read)

14    A    What allegations did I hear of before the meeting?

15    Q    That's my question.

16    A    The ones I told you before, the same answer.

17    Q    So before the meeting took place between

18      Mr. Correa and Ms. Hasan, you had already heard

19      complaints about Mr. Correa; is that what you're

20      saying?

21    A    Yes.

22    Q    All right. Let's talk about what you put on the

23      record. When did you learn that he was having

24      problems with misuse of chemicals? When was the

25      first time you learned of that?

1   A   That was probably months before the meeting.

2   Q   Okay.

3   A   I mean, it was ongoing for a little bit, but the

4       first time was probably months earlier.

5   Q   Can you tell me approximately what month?

6   A   No.

7   Q   How did you learn of this allegation against

8       Mr. Correa?

9   A   It would have been through a meeting with

10      Jose Lopez.

11  Q   Did you write any notes about the meeting with

12      Jose Lopez regarding the misuse of chemicals on

13      the part of Mr. Correa?

14  A   No.

15  Q   Do you know if anyone did?

16  A   I only can answer for myself.

17  Q   So you didn't keep any notes of information that

18      you were getting from Mr. Jose Lopez about

19      Mr. Correa?

20  A   Not at those impromptu meetings, no.

21  Q   What about the allegation that he was overfilling

22      the tanks?  When did you learn about that

23      allegation?

24  A   All the same time period.

25  Q   Which is?



ESQUIRE
DEPOSITION SOLUTIONS

| | | |
|---|---|---|
| 1 | A | Months earlier ongoing. |
| 2 | Q | Do you know the year? |
| 3 | A | This is -- do you know the year of the |
| 4 | | disciplinary action?  As I said, it was before the |
| 5 | | disciplinary action.  I don't remember the exact |
| 6 | | year of that. |
| 7 | Q | Well, was it two months, several months? |
| 8 | A | I told you it was months before the disciplinary |
| 9 | | action.  I thought that was pretty clear. |
| 10 | Q | With respect to the allegation regarding the |
| 11 | | overfill of the tanks, did you make any notes |
| 12 | | about your discussions regarding Mr. Correa? |
| 13 | A | No. |
| 14 | Q | What about the allegation that he was leaving the |
| 15 | | company and coming back?  When did you hear that |
| 16 | | for the first time, sir? |
| 17 | A | I believe it was the day before the disciplinary |
| 18 | | action is when I heard about it. |
| 19 | Q | Days?  How many days before? |
| 20 | A | Maybe a day or two at most. |
| 21 | Q | Did you make any notes about your discussions |
| 22 | | regarding that allegation that he was leaving the |
| 23 | | company? |
| 24 | A | No. |
| 25 | Q | Any reason why you didn't make any notes about |

1   these allegations, sir?

2   A   It's not my job to manage the HR requirements of

3       our company.

4   Q   That wasn't my question.  I'm asking you is there

5       any reason why you didn't make any notes about

6       allegations that apparently you considered pretty

7       serious?

8                   MR. SENECZKO:  And I would object

9           that that is answered.  The witness did

10          answer the question.

11  Q   Go ahead, sir.

12  A   No.  I answered your question.

13  Q   You gave me an evasive answer.  I don't mean to

14      argue with you.  Listen to the answer you provided

15      to me.

16                  MR. ARELLANO:  Madame Reporter, can

17          you please read my question and his answer.

18                  (Question and answer read)

19  A   There you go.

20  Q   So can you tell me a reason why you didn't make

21      any notes about these allegations against

22      Mr. Correa?

23  A   How many times do you want me to repeat that it

24      was not my job to make these notes.  That is my

25      reason for not taking notes.

1   Q   All right.  So you don't have any notes?

2   A   Correct.

3   Q   All right.  The information regarding the

4       overflowing -- or overfilling of the tanks, did

5       that come from Jose Lopez?  I suspect that because

6       he's the plant manager, right, I mean --

7   A   Yes.

8   Q   -- the information regarding leaving the company

9       grounds came from Jose Lopez I suspect; is that

10      correct?

11  A   I believe that actually came when I was talking to

12      Atiya Hasan about her upcoming disciplinary

13      meeting that she was going to have with

14      Mr. Correa.

15  Q   And you know, do you not, that Mr. Lopez was part

16      of that meeting; correct?

17  A   Yes.

18  Q   And Ms. Hasan does not work out in the plant of

19      Elite Finishing, does she?

20  A   No.  Not on a regular basis, no.

21  Q   The person in charge of monitoring Mr. Correa

22      would have been Jose Lopez; correct?

23  A   Yes.

24  Q   Did you -- before terminating Mr. Correa, did you

25      ever ask Mr. Correa about any of these allegations

1       that you just mentioned on the record, the

2       overfilling of the tanks, leaving the company

3       grounds, mixing the chemistry or the chemicals --

4       did you ever talk to Mr. Correa about those

5       concerns, sir?

6   A   No.

7   Q   So just so I understand, tell me the specific

8       reasons why you decided to terminate Mr. Correa.

9   A   The main reason that I decided to eliminate or

10      to --

11  Q   Terminate.

12  A   -- terminate Mr. Correa was because when we had

13      the disciplinary hearing with him, or meeting with

14      him, and tried to get him to understand that we

15      needed to correct some of these issues that were

16      ongoing.  He told us that they were not issues and

17      he was not going to correct these issues.  He was

18      going to continue to leave the plant without

19      notifying the supervisors.  He was going to

20      continue to leave the plant without punching out,

21      and that he did not believe this was an issue.

22      And that was why he was terminated.  Along with

23      the idea that when he left he was very disgruntled

24      and very upset and very angry with our people.

25      And he was working in a department that has very

1      high liability to this company, where I did not
2      want a disgruntled employee that was not willing
3      to follow corporate -- or company rules involved
4      where he could pollute the city's water supply and
5      cause community issues as well as legal issues
6      with my company.
7   Q  All right.  Any other grounds other than what you
8      just mentioned?
9   A  That is my reason for doing it.
10  Q  Did you ever receive any complaints from the city
11     about contamination, as you put it here so
12     dramatically?
13  A  No.
14  Q  Okay.  Do you recall any one time when you had to
15     call outside help because of the mistakes that you
16     claim Mr. Correa was making?
17  A  Not outside help, no.
18  Q  Now, these allegations that you just cited on the
19     record as your reasons for terminating him, they
20     came to you from Ms. Hasan and Mr. Lopez; isn't
21     that correct?
22  A  Yes.
23  Q  And did they provide you a memo about what had
24     happened at the meeting?
25  A  No.  I discussed it with them verbally.

1    Q    Okay.

2    A    And I believe Atiya does have the form which she

3         brought to the meeting to go over with Mr. Correa.

4         And he would not sign it because he did not

5         believe that anything needed to be corrected, and

6         he did not agree with the requests that we were

7         making.

8    Q    But after you heard all that list of complaints,

9         you never called Mr. Correa to discuss those

10        complaints with him; correct?

11   A    Correct.

12   Q    Did Jose Lopez or Ms. Hasan tell you that

13        Mr. Correa protested at that meeting on the basis

14        of discrimination?

15   A    No.

16   Q    Do you have a policy that prohibits discrimination

17        in the workplace?

18   A    We have policies in place, yes.

19   Q    Have you ever read those policies yourself, sir?

20   A    A long time ago, yes.

21   Q    Is there a policy within your company rules that

22        prohibits retaliation against a person that

23        complains about discrimination?

24   A    Yes.

25   Q    So if Mr. Correa would complain that he was

1    treated differently on the basis of his race, you

2    would agree that that would be a protected

3    activity on his part; correct?

4  A  He never protested that.

5  Q  You never asked him, did you?

6  A  I don't go around asking people if they're

7    protesting discrimination.  I react if someone

8    tells me that they've been discriminated against

9    or they believe they were.  But if nobody tells me

10   anything, I'm not going around walking up to every

11   employee saying, "Are you being discriminated

12   against?"

13 Q  All right.  Do you believe that the company must

14   treat every employee equally regardless of race,

15   color, or creed?

16 A  Oh, yeah, absolutely.

17 Q  So if Mr. Correa would be disciplined for walking

18   out of a company, you would agree that any other

19   non-African, Puerto Rican would be treated the

20   same if they did the same thing that he was

21   accused of doing; correct?

22 A  Absolutely.

23 Q  With respect to the allegation that Mr. Correa was

24   leaving the company grounds, did Jose or Ms. Hasan

25   tell you that Victor Orozco would often leave

 1   | early?
 2   | A   Repeat that again because I think you're asking
 3   |     two different things.
 4   |                 MR. ARELLANO:  Madame Reporter.
 5   |                 (Question read)
 6   | A   On the way Victor -- I'm sorry, as the way
 7   |     Mr. Correa was leaving the grounds, he was leaving
 8   |     the grounds without permission, without punching
 9   |     out.  Victor Orozco was -- never left the facility
10   |     without getting permission.  And when he did get
11   |     permission to leave, he punched out when he left
12   |     and he punched back in when he came back.  That is
13   |     something that Mr. Correa never did.  So it's not
14   |     the same thing.
15   | Q   By virtue of your answer, sir, I suspect you knew
16   |     that Victor Orozco was leaving company grounds
17   |     early before you terminated Mr. Correa; is that
18   |     correct?
19   | A   Victor Orozco was getting permission to leave the
20   |     facility and grounds and punching out and coming
21   |     back in prior to that, yes.  So it's a totally
22   |     different scenario from what Mr. Correa was doing.
23   | Q   I want you to listen to my question.
24   |                 MR. ARELLANO:  Madame Reporter, my
25   |         last question, please.

```
 1                        (Question read)
 2    Q    You knew of that fact; correct?
 3    A    I knew that Victor Orozco would gain permission,
 4         punch out and leave the grounds early prior to the
 5         termination of Mr. Correa.
 6    Q    Did you know that another employee by the name of
 7         Alejandro was also leaving the company before time
 8         and was not disciplined?
 9    A    Alejandro never left the company without
10         permission or without punching out or punching
11         back in.  So what he was doing in essence was per
12         company policy.  So that is not the same thing as
13         what Mr. Correa was doing.
14    Q    But you knew that Alejandro was leaving early
15         regardless; true?
16    A    I knew he was leaving early with permission.
17    Q    And you knew that --
18    A    And punching out, yes.
19    Q    You knew that before Mr. Correa was terminated;
20         correct?
21    A    I knew that he was leaving with permission, yes.
22    Q    Before you terminated Mr. Correa, did you ever
23         look into Victor Orozco's file to see if there was
24         any kind of approval for his early release?
25    A    The file would not have that approval in it.  That
```

```
 1        wouldn't help me if I -- no, I did not look into

 2        the file because it wouldn't be there.

 3   Q    Well, have you ever seen any record, document,

 4        email where Victor Orozco was given a written

 5        early release by the company?

 6   A    A written release is not required by our company,

 7        so no, I have not seen one.

 8   Q    What about Alejandro?  Have you ever seen any

 9        written release for Alejandro?

10   A    Is that a requirement of our company to have a

11        written release?  So no, I have not seen a written

12        release for him either.

13   Q    And in fact, Alejandro and Victor Orozco would

14        leave early on a regular basis; isn't that

15        correct?

16   A    I would not say a regular basis.  Both had

17        children to take care of that they had a

18        conversation with their supervisor to deal with

19        some issues.  And they dealt with them on a basis

20        when necessary, yes.

21   Q    So before you terminated Mr. Correa, you knew that

22        Victor and Alejandro would regularly leave early;

23        is that true?

24   A    I knew that they would leave with permission, yes.

25        And that's not why I terminated Mr. Correa.
```

1   Q   All right.  And you never talked to Alejandro

2       and/or Victor in order to determine why they were

3       leaving early, you personally; correct?

4   A   No, no.

5   Q   When Mr. Correa was working for Elite Finishing,

6       was he working the mornings, the day shift, or the

7       night shift?

8   A   Prior to his termination, he was working the night

9       shift.

10  Q   And you are aware, are you not, that during the

11      day shift there was an overflow of the tanks, of

12      the waste treatment unit; isn't that correct?

13  A   I'm not personally aware of one that I can think

14      of.

15  Q   Well, how many times did you see any overflow of

16      the tanks, as you put it, during the night shift?

17  A   Personally, I did not see a night overflow

18      personally.

19  Q   Well, how many times were you told that there was

20      an overflow during the night shift?

21  A   I know of at least two or three times that I was

22      told that there were overflows.

23  Q   Did you ever see any reports every time that there

24      was an overflow in the waste treatment?

25  A   I would have to look back at records to see the

1           records on that.

2      Q    So this overflow allegation that you have raised

3           today was because you were told by Jose Lopez; is

4           that correct?

5      A    Yes.

6      Q    And the mixing of the chemicals, do you know that

7           there was a mixing of the chemicals during the day

8           shift?

9      A    Yes.  And that was corrected.

10     Q    How many times did you learn that there was a

11          mixing of the chemicals?

12     A    I know of one time in particular.

13     Q    How many times were you told that there was a

14          mixing of the chemicals during the night shift?

15     A    There were several.  I can't remember the amount.

16     Q    And given the seriousness of this allegation, I

17          suspect there are some reports to support your

18          sworn statements here today; is that correct?

19     A    What seriousness are you talking about?

20     Q    Mixing of the chemicals.  Isn't that a serious

21          mistake?

22     A    What do you mean by serious?  I'm not

23          understanding your terminology.

24     Q    Let's go back to my question.  Did you ever see

25          any reports?



1   A   I have not seen -- no, there would not be a report

2       on that, no.

3   Q   So the allegation about mixing of the chemicals,

4       that would have come from Jose Lopez; isn't that

5       correct?

6   A   Yes.  And other people as well because it creates

7       a smell that makes the area very -- it's not

8       irritable, but it's not a good smell.  It's like

9       rotten eggs.  So it makes it very bad for

10      people -- it's just a bad smell for people to

11      have.  It's an uncomfortable smell.

12  Q   And your testimony is that there is no report

13      anywhere about the smell of eggs from bad

14      chemicals; is that correct?

15  A   Correct.

16  Q   All this information came to you from Jose Lopez

17      and you claim other witnesses; is that right?

18  A   Well, yes.  Because when there's a bad smell,

19      everybody in the facility will complain about that

20      bad smell.  So it's not just coming from one

21      person necessarily.  My official way was through

22      Jose, but I was told by many of the employees that

23      there was a really bad smell again last night.

24      And it was caused by the waste treatment

25      department.

1   Q   Give me the names of the employees that came to

2       complain to you about the smell of the mixing of

3       the chemicals besides Jose Lopez?

4   A   Greg Mallum.  I'm sure Karen Klussman, she

5       definitely would have been one of them.  I mean, I

6       could probably list the whole facility because at

7       one point or another someone came up to me about

8       it because it's just a very unpleasant smell.

9   Q   And do you recall approximately when you learned

10      from all these witnesses about the smell due to

11      the mixing of the chemicals?

12  A   There are several occasions prior to -- months

13      prior to -- for months prior to the actual date of

14      the disciplinary meeting.  But I can't remember

15      exact dates.

16  Q   When you learned about this serious allegation,

17      sir, did you ever talk to Mr. Correa?

18  A   No.

19  Q   Did you write it down someplace?

20  A   No.

21  Q   So you were concerned that they could pollute the

22      city --

23  A   They're not polluting with a smell.

24  Q   So you didn't make a note?  You don't remember

25      what day or when these things were said to you?



```
 1    A    No.
 2    Q    Did you take any action when you learned about
 3         these serious mistakes regarding the mixing of the
 4         chemicals?
 5    A    I told Jose to make sure that he gets the operator
 6         to properly do the mixing properly.
 7    Q    And all of the witnesses that you believe came to
 8         you, did they blame Mr. Correa?  Is that what
 9         you're saying?
10    A    Yes.  Because he was the only one in that area
11         that was working with the chemistry, yes.
12    Q    You mean there are people who came and said it was
13         Mr. Correa who did it?
14    A    I don't know if they used his name, but they knew
15         that waste treatment was smelling again.  And he
16         was the only person in that area that was working
17         at that time.
18    Q    But Victor was also working in that unit; isn't
19         that true?
20    A    Not at the time the smell would happen.
21    Q    He was working during the day shift; true?
22    A    Correct.
23    Q    And your testimony is that no one ever complained
24         about Victor with respect to mixing of the
25         chemicals?
```



1   A   No.  I told you there was one time that we had a

2       smell during the day and it was corrected.

3   Q   Did anyone ever complain about Victor overfilling

4       the tanks?

5   A   Not that I'm aware of.

6   Q   Were you involved in the hiring of Mr. Correa?

7   A   No.

8   Q   Who was the person who hired Mr. Correa?

9   A   I believe he was hired through Jose Lopez and

10      Atiya Hasan.

11  Q   Were you the person who hired Mr. Jose Lopez?

12  A   No.  He was hired prior to me being in charge

13      here.

14  Q   Were you involved in the hiring of Victor Orozco?

15  A   No.

16  Q   What about Alejandro?

17  A   No.

18  Q   So before you terminated Mr. Correa, you knew that

19      Victor Orozco also had some issues at the water

20      waste treatment facility; correct?

21  A   Yes.  He worked very good at correcting his issues

22      and moved forward very well.

23  Q   You also knew that Victor Orozco had issues with

24      overfilling of the tanks; correct?  I think you

25      mentioned one in particular.



1   A   No.  I told you I was not aware of any that I
2       could think of.
3   Q   Did you ever ask Jose Lopez about Victor Orozco
4       before you terminated Mr. Correa?
5   A   No.  I didn't ask him about Victor.  I didn't ask
6       him about any other employees for that matter.
7   Q   You were convinced that it was only Mr. Correa; is
8       that right?
9   A   Mr. Correa is the only person at that time that
10      was saying that he did not have to abide by our
11      rules of punching in and punching out when you
12      leave and come back to the company.  And he
13      believed he didn't have to talk to a supervisor to
14      leave the company.  That is why I fired
15      Mr. Correa.
16  Q   But you never heard Mr. Correa say that to you;
17      correct?
18  A   Not to me personally, no.
19  Q   You were not present at the meeting; correct?
20  A   Correct.  But he did not sign his complaint saying
21      that he did not believe he needed to correct
22      anything.
23  Q   Did that in any way alert you to the idea that
24      Mr. Correa had some issues he wanted to discuss
25      with you?

| | | |
|---|---|---|
| 1 | A | He never approached me for any issues. |
| 2 | Q | You didn't ask him to?  You just fired him the |
| 3 | | next day after the meeting; correct? |
| 4 | A | Correct.  I'm very open, and I allow employees to |
| 5 | | come to see me anytime for any reason.  And I do |
| 6 | | walk the floor occasionally to make sure that I'm |
| 7 | | available. |
| 8 | Q | But again you knew of several issues regarding |
| 9 | | Mr. Correa with his handling of the water waste |
| 10 | | treatment, but you never spoke to him about it; |
| 11 | | correct? |
| 12 | A | Correct.  I do not overstep my supervisors.  I |
| 13 | | allow them to supervise their people. |
| 14 | Q | You knew that Mr. Correa was accused of leaving |
| 15 | | the building, but you never spoke to him about it |
| 16 | | to hear his side of the story, did you? |
| 17 | A | No.  I did not speak to him directly on it, no. |
| 18 | Q | You knew that Victor and Alejandro would leave |
| 19 | | early as well, and you have never spoken to them |
| 20 | | about leaving early? |
| 21 | | MR. SENECZKO:  I object.  That's |
| 22 | | asked and answered several times. |
| 23 | Q | Go ahead, sir. |
| 24 | A | I believe my attorney said it was asked and |
| 25 | | answered. |



```
 1                  MR. SENECZKO:  Jaime, when I
 2          object, it's for the record.  Unless I
 3          instruct you not to answer --
 4                  THE WITNESS:  Okay.
 5                  MR. SENECZKO:  -- you still have to
 6          answer the question.  And if there was
 7          something inappropriate about the question, I
 8          can always take it up with the court later.
 9          But once I object, you listen and then you
10          answer.
11                  THE WITNESS:  Okay.  Thank you for
12          the explanation.
13                  MR. ARELLANO:  Counsel, you are
14          partly correct, but this question is asked in
15          a different context.
16              So, Madame Reporter, can you please read
17          my question.
18                  (Question read)
19  A   I do not -- I did not speak to them because they
20      did not leave early without permission.  And when
21      they did leave, they punched out and they punched
22      back in when they came back to work.  So they did
23      not violate policy as Mr. Correa had been doing.
24                  MR. ARELLANO:  I move to strike the
25          rest of his answer, Judge.
```

```
 1   Q   Sir, you mentioned at the beginning of your
 2       deposition that you were involved in the hiring of
 3       employees; is that correct?
 4   A   Some employees, yes.
 5   Q   And you are always aware when somebody new comes
 6       into the company as an employee; correct?
 7   A   No.
 8   Q   But you knew that Mr. Correa -- by virtue of all
 9       the things that you have cited on the record, you
10       knew that Mr. Correa was one of your employees;
11       correct?
12   A   Yes.  I knew he was an employee, yes.
13   Q   And you had access to his personnel file, did you
14       not?
15   A   Yes, I had access.
16   Q   And I'm sure you as a competent manager, you
17       reviewed his personnel file, correct --
18   A   No.
19   Q   -- at some point?
20   A   No.
21   Q   Not after he was hired?
22   A   No.
23   Q   Not before you terminated him?
24   A   No.
25   Q   Who is the person who does most of the hiring at
```

1    Elite Finishing?

2  A  The hiring is done at Elite Finishing between

3     Jose Lopez and Atiya Hasan.

4  Q  And do you know if Atiya Hasan speaks Spanish?

5  A  I do not know all of her capabilities, but I'm not

6     sure if she can or cannot speak Spanish.

7  Q  But you know that Jose Lopez is bilingual, Spanish

8     and English; correct?

9  A  Correct.

10  Q  And so with respect to employees who are not

11     bilingual, Jose Lopez would be the main individual

12     to recommend the hiring of those employees who are

13     Spanish speaking; correct?

14  A  No.  I believe they work together on all hirings.

15  Q  But Jose Lopez would be the only person in

16     management that speaks Spanish; is that correct?

17  A  Boy.  He's probably the most fluent manager we

18     have in Spanish, yes.

19  Q  And he would be the one to go to as far as his

20     plant is concerned?  Employees would go to

21     Jose Lopez as the main supervisor, is that

22     correct, not to you?

23  A  Correct.

24  Q  And Jose Lopez also had the authority to hire

25     and/or fire employees; is that true?

1  A   Not without -- he does not have control to fire

2      people on his own, no.

3  Q   So he would have to consult with you and share

4      with you his views; true?

5  A   He would have to consult with myself and Atiya for

6      any firing or termination.

7  Q   And that's what he did in this case with respect

8      to Mr. Correa; is that correct?

9  A   No.  Because Jose was only there as an interpreter

10     at the meeting.  I was the only one that set the

11     termination hearing.  He was not there for

12     termination.  He was there as an interpreter.

13                  MR. ARELLANO:  Can you read my

14          question back for the witness.

15                  (Last two questions and answer

16                  read)

17 Q   Is that correct, sir?

18 A   I guess I'm really not understanding how your

19     question is stated.  Could you restate your

20     question, please.

21 Q   Don't worry.  I'll withdraw that question.  The

22     rest remains on the record.

23                  MR. ARELLANO:  I think that's all I

24          have, Counsel.

25                  MR. SENECZKO:  Okay.  I just have a

1            couple quick questions, Jaime.

2

3                    EXAMINATION

4    By Mr. Seneczko:

5    Q   When you talked about the overfill or overflow of

6        the tanks being an issue that you had a problem

7        and Mr. Correa was one of the issues you

8        discussed, do you recall that testimony?

9    A   Yes.

10   Q   Can you explain -- can we just clarify what's

11       exactly the problem there?

12                   MR. ARELLANO:  I'm going to object

13           as asked and answered.  Now you can proceed.

14   A   The overflow creates an abundance amount of extra

15       work and extra cost as the overflow tank goes to a

16       catch area.  And then that catch area then has to

17       be sucked up with pumps and reprocessed and resent

18       through the pollution waste treatment system.  And

19       it's a very expensive process.

20   Q   Well, let me rephrase my question.  Can you

21       explain why that was an issue relative to

22       Mr. Correa, why you said that was something you

23       had a problem with him?

24                   MR. ARELLANO:  Go ahead, Counsel.

25           Objection.  Leading.  Asked and answered.

1   Q   Go ahead, Jaime.

2   A   The problem I had with Mr. Correa doing the

3       overflow is it creates more cost for the company.

4       And we're trying to get, you know, reduce our

5       costs.  And when people overflow, basically it's a

6       failure to do your job properly.  It's

7       incompetent.  And it's a cost that we can easily

8       remove if the person just follows the right

9       process.

10  Q   Well, how was it that you determined that

11      Mr. Correa was responsible for the overflow?

12                    MR. ARELLANO:  Objection.

13  A   The timing of it.  It was done during the time

14      that he was there.

15  Q   Well, how would an overflow occur?

16  A   The -- in our process there is continuous flow in

17      our cleaning system that goes into our waste

18      treatment area.  And if the operator doesn't

19      control the incoming flow and the outcoming flow

20      properly and maintain the process, there can be a

21      backup on one of the tanks and then that tank will

22      overflow.  And it's because of being -- not

23      monitoring the right thing.  That's how it

24      happened.

25  Q   Now, did you have occasion -- did you ever

1     personally interact with Mr. Correa during his

2     employment?

3  A  Other than saying "hi" or waving as I went through

4     the plant, that's probably the extent of it.

5  Q  So you never had any meetings with him or

6     discussions?

7  A  No.

8                    MR. SENECZKO:  No, okay.  I have

9          nothing further, Victor.

10                   MR. ARELLANO:  Yeah.  Me neither.

11         Thank you.

12

13                   (Adjourning at 12:12 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1    STATE OF WISCONSIN       )
                              ) ss.
2    COUNTY OF DANE           )

3      I, TAUNIA NORTHOUSE, a Registered Diplomate Reporter

4    and Notary Public in and for the State of Wisconsin, do

5    hereby certify that the foregoing deposition was taken

6    before me remotely, on the 28th day of September 2021;

7    that it was taken at the request of the Plaintiff, upon

8    verbal interrogatories; that it was taken in shorthand

9    by me, a competent court reporter and disinterested

10   person, approved by all parties in interest and

11   thereafter converted to typewriting using computer-aided

12   transcription; that said deposition is a true record of

13   the deponent's testimony; that the appearances were as

14   shown on Page 3 of the deposition; that the deposition

15   was taken pursuant to notice; that said

16   JAIME J. MALISZEWSKI before examination was sworn by me

17   to testify to the truth, the whole truth, and nothing

18   but the truth relative to said cause.

19           Dated October 6, 2021.

20           _____

21           Registered Diplomate Reporter
             Notary Public, State of Wisconsin

22

23

24

25
```