UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DANIEL CORREA-OSORIO,

        Plaintiff,

  v.                                      Case No. 21-cv-0235-bhl

ELITE FINISHING LLC,

        Defendant.

---

### DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

On March 25, 2019, Elite Finishing, LLC (Elite) ostensibly fired Daniel Correa-Osorio for repeatedly leaving work early without permission, taking significant breaks at work without clocking in and out, and responding poorly when he was issued a warning about these deficiencies. (*See* ECF No. 45-4 ¶¶36–37.) Correa, who is Afro-Puerto Rican, later filed a complaint alleging that the real reason for his discharge was race discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. (ECF No. 1 at 1.) After Elite moved to dismiss, Correa amended his complaint and now asserts claims solely under Section 1981. (ECF Nos. 6 & 10.) Elite has moved for summary judgment. (ECF No. 33.) For the reasons given below, Elite's motion must be denied.

### FACTUAL BACKGROUND[1]

Elite Finishing, LLC is a metal finishing servicer for parts manufacturers in Milwaukee. (ECF No. 34 ¶1.) Elite employs nine regular and twenty-five temporary employees. (*Id.*) Correa is Afro-Puerto Rican and worked at Elite for five years, first as a racker, then as a waste treatment operator. (ECF No. 34 ¶¶1, 13; ECF No. 45 at 1; ECF No. 51 ¶2.) Correa had the night shift, working from 7:00 p.m. until 7:30 a.m., with a 30-minute lunch break. (ECF No. 51 ¶3.)

---

[1] Where possible, these facts are drawn from the parties' proposed statements of undisputed facts (and responses). (ECF Nos. 34, 45-4, 51.) Discrepancies are noted.

Jaime Maliszewski, who is white, is Elite's part-owner and General Manager. (ECF No. 34 ¶2.) Maliszewski is also responsible for Elite's final termination decisions. (*Id.*) Jose Lopez, who is Mexican, was Elite's Plant Manager. (*Id.* ¶9; ECF No. 45-4 ¶9.) Atiya Hasan, who is Pakistani, serves as Elite's human resources manager, and, while generally responsible for disciplinary decisions, does not have complete authority over firings. (ECF No. 34 ¶8.) Carmelo Cervera, who is Mexican, was the second shift supervisor. (*Id.* ¶10.) Cervera was Correa's immediate supervisor and Lopez's direct report. (*Id.*) Alejandro Gonzalez, who is also Mexican, worked as a wrapper at Elite. (ECF No. 51 ¶11; *see also* ECF No. 39 at 51–53.) Victor Orosco-Rivera (Orosco), who is also Mexican, is a waste treatment operator on the first shift with the same duties as Correa. (ECF No. 34 ¶11.)

Elite's relationship with its employees is governed by an Employee Handbook, which the company provides to all employees in both English and Spanish. (*Id.* ¶4.) The Handbook contains Elite's equal employment opportunity policy, harassment policy, retaliation policy, and time-card policy. (*Id.* ¶4–5.) The time-card policy says: "'If one has to leave the plant during work hours, permission from the supervisor is required before leaving. When leaving the plant punch out and punch in when returning." (*Id.* ¶5.) Elite also has a set of "shop rules" that prohibit employees from leaving the plant during work hours without notifying a supervisor or human resources manager. (*Id.* ¶6.) Possible penalties for violating this rule include discipline and discharge. (*Id.*) Correa admits he was aware of Elite's timekeeping policy. (*Id.* ¶14.)

Correa was warned on two separate occasions about his noncompliance with the company's policies about leaving work early. The first warning came during a June 12, 2017 annual review, when Correa received an evaluation completed by Lopez that noted Correa "often left work early and sometimes left his work incomplete." (*Id.* ¶16.) Correa does not appear to have suffered any adverse action as a result of this evaluation.

Correa received a second warning two years later. In early March 2019, Correa's second shift supervisor, Cervera reported to Lopez (the Plant Manager) that two of Correa's co-employees were complaining about Correa leaving work early almost every day without completing his duties. (*Id.* ¶17.) One of the complaining co-employees, Orosco, had the next shift and protested that Correa was repeatedly departing work without emptying tanks and with press filters dirty and clogged, leaving Orosco to address those issues at the start of his shift. (*Id.* ¶18.) Lopez relayed these complaints to Hasan on March 21, 2019. (*Id.* ¶19.)

After receiving Lopez's report, Hasan began an investigation. (*Id.* ¶20.) She first spoke with Cervera, who confirmed having ongoing problems with Correa leaving early and not finishing his duties. (*Id.*) Cervera also indicated that other employees complained that Correa was not at work when he was supposed to be, he was taking prolonged lunch breaks, and he remained punched in during periods he was absent. (*Id.*) Cervera admitted he had given Correa permission to leave work early on a couple of occasions but maintained that Correa was now leaving early without permission "all the time." (*Id.*) Hasan then reviewed Correa's timecards, which showed Correa was regularly punching out and leaving work before the end of his shift. (*Id.* ¶21.) In fact, Correa's timecards showed that in just the month of January he had left work before his shift ended ten times. (*Id.*) He had done so five times in February and four more times in March. (*Id.*) Correa's timecards showed no indication from either Cervera or Lopez that they had approved his early departures, and both confirmed to Hasan that they had not authorized Correa to leave early on the dates indicated. (*Id.* ¶22.)

Following her investigation, Hasan decided she would meet with Correa, issue him a formal disciplinary warning, and review the issues concerning his performance. (*Id.* ¶23.) She admits she did not plan to fire him. (*Id.*) Hasan then prepared a written Employee Warning Notice that listed the issues she had flagged during her investigation and that she planned to address in the meeting. (*Id.* ¶24.)

The meeting took place on March 22, 2019 and was attended by Hasan, Correa, and Lopez. (*Id.* ¶25.) Hasan gave Correa the Employee Warning Notice and told him that the purpose of the meeting was to issue a warning and not to terminate employment. (*Id.*; ECF No. 38 ¶19.) She reviewed Correa's performance issues, including his pattern of leaving work early without permission. (ECF No. 34 ¶25.) The parties offer vastly different and competing characterizations of the meeting and Correa's response to the criticisms.

According to Hasan and Lopez, Correa "refused to acknowledge his deficiencies" and told Hasan that he "was doing his job well." (*Id.* ¶26.) Then, instead of offering to correct his performance issues, he asked for a raise. (*Id.*) Correa then disputed that he had not notified his supervisor before leaving. (*Id.*) Hasan responded that she had spoken to Cervera, who, while acknowledging that Correa had alerted him before leaving early on a few occasions, also reported that Correa was now "consistently leaving early." (*Id.*) According to Hasan, she then told Correa he needed to obtain Cervera's initials every time he left early. (*Id.* ¶¶26–27.) When Correa

objected that he was the only employee subject to this protocol, Hasan explained that the protocol applied to him because he had been abusing the situation. (*Id.* ¶27.) She also told Correa that he was only entitled to one thirty-minute lunch break and if he exceeded that amount of time, he would be "falsifying his time records." (*Id.* ¶30.) According to Hasan and Lopez, as the meeting progressed, Correa "became increasingly angry and upset, raising his voice and becoming aggressive." (ECF No. 45-4 ¶31.)

Correa tells a different story. He contends he was "not angry but rather offended," and denies being aggressive. (*Id.*) He also claims having raised the issue of discrimination. (ECF No. 41 at 39.) More specifically, Correa contends that he reported in the meeting that Lopez had previously made racially offensive remarks to him, calling him a "negro" and saying "these fucking Puerto Ricans, they're useless," and "these negroes, they're useless." (ECF No. 45-4 ¶32.) Correa also claims that he had routinely confronted Lopez about these comments prior to the meeting. (*Id.* ¶38.)

Hasan and Lopez deny that Correa ever suggested he had been discriminated against due to his skin color or nationality at the meeting. (ECF No. 36 ¶26; ECF No. 38 ¶21.) Lopez also denies ever making any discriminatory remarks about or to Correa. (ECF No. 38 ¶23.) According to Elite's witnesses, Correa never complained to Hasan, Maliszewski, or anyone else that he was being discriminated against on the basis of race, ethnicity, or national origin.[2] (ECF No. 34 ¶¶32, 43.)

Although Hasan admits the meeting was only meant for disciplinary action, she insists Correa's conduct at the meeting increased her level of concern. (*Id.* ¶33.) In particular, Correa's lack of ownership of his deficiencies was problematic. Hasan considered Correa as having an important position at Elite and wondered whether having a "disgruntled employee" like Correa in such a role might cause harm to the company or the general public. (*Id.*) Accordingly, she reported

---

[2] The parties agree that as Correa left the meeting, he told Hasan that he had recorded it. The status of this recording is a major point of contention. Correa claims he made and maintained a recording of the meeting on a LG K-20 cell phone. (*Id.* ¶45.) When he first raised his discrimination allegations before the Wisconsin Equal Rights Division, he provided only a short forty-five second excerpt of the recording. (*Id.* ¶46.) He has produced a copy of that excerpt in this case, (*id.* ¶49), but the sound quality is poor, and it is largely unhelpful in corroborating either side's version of events. Elite's efforts to obtain the original recording through discovery have not been fruitful and Correa's explanations for his inability to produce it have been frustratingly inconsistent. Correa now claims he cannot provide the recording because he replaced the original cell phone in the summer of 2020 due to a broken screen. (*Id.* ¶47.) During his first deposition, however, Correa claimed he lost the recording because his cell phone was stolen around April 2021. Then, at a second deposition, he testified that the cellphone was stolen in 2020. (*Id.* ¶¶50–51.)

on the outcome of the meeting to Maliszewski, who then followed up with Lopez, who confirmed Hasan's account of the meeting. (*Id.* ¶35.)

Ultimately, Maliszewski decided to terminate Correa's employment and notified Correa of this decision on March 25, 2019. (*Id.* ¶¶12, 36.) Maliszewski claims he decided to fire Correa because Correa "failed to acknowledge" his deficiencies, the risk of "potential liability and danger a disgruntled employee like" Correa could create in his important position, and Correa's "angry reaction to the disciplinary warning and his state of mind when he stormed out of the meeting." (*Id.* ¶36.) Maliszewski testified that hearing of Correa's poor job performance and leaving work early did not prompt him to terminate Correa's employment. (ECF No. 43 at 20–21.) His entire reason for terminating Correa was his reaction to the March 22 meeting. (*Id.* at 26–27.) According to Maliszewski, this decision was not based on Correa's race, ethnicity, or skin color. (*See id.*; ECF No. 45-4 ¶37.) After Maliszewski told Hasan of his decision, Hasan prepared a letter of termination and gave it to Correa's girlfriend—another Elite employee—to give to Correa prior to his shift that night. (ECF No. 34 ¶40.)

The termination letter is dated March 25, 2019. It states that Correa's termination was based on "unsatisfactory performance and violation to company's policies and procedures." (ECF No. 51 ¶22; ECF No. 36-7 at 1.) The letter does not mention Correa's reaction at the meeting. (ECF No. 36-7.) While Elite's supervisors maintain that Maliszewski alone made the decision to terminate Correa's employment, Correa contends that both Hasan and Maliszewski made the termination decision. (ECF No. 34 ¶38; ECF No 45-4 ¶36.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Id.* at 248; *Contreras v. City of Chicago*, 119 F.3d 1286, 1291–92 (7th Cir. 1997). A dispute over a material fact is "genuine"

only if a reasonable trier of fact could find in favor of the non-moving party on the evidence presented. *Anderson*, 477 U.S. at 248.

The moving party bears the burden of proving the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To survive a properly supported summary judgment motion, the opposing party must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citation omitted). If the parties assert different views of the facts, the Court must view the record in the light most favorable to the nonmoving party. *E.E.O.C. v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000).

## ANALYSIS

Elite argues that it is entitled to summary judgment because no reasonable factfinder could conclude that Correa's race, ethnicity, or skin color was the "but for" cause of his termination. Elite further contends that Correa cannot show that he would not have been terminated "but for" his having engaged in protected activity. (ECF No. 35 at 2.) While the record could certainly be interpreted to suggest that Elite fired Correa for legitimate reasons, the undisputed facts do not compel this conclusion. Accordingly, Elite's motion for summary judgment must be denied.

**I.  Correa Has Proffered Sufficient Evidence to Defeat Summary Judgment on His Employment Discrimination Claim.**

Correa claims that Elite discriminated against him on the basis of his race (African) and ethnicity (Puerto Rican) in violation of section 1981. (ECF No. 10 ¶1.) Claims under 42 U.S.C. § 1981 and Title VII have a "largely identical" legal analysis. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) (citing *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019)). Section 1981 claims must show that race was a "but-for" cause of the injury, whereas Title VII claims simply require race be a "motivating factor." *Id.* At summary judgment, the dispositive question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

In undertaking this analysis, the Court employs the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The plaintiff must first come forward with sufficient evidence to create a prima facie case of discrimination through a "showing that (1) he is a member of a protected class, (2) he was meeting the employer's legitimate expectations,

(3) he suffered an adverse employment action, and (4) similarly situated employees who were not members of his protected class were treated more favorably." *Reives v. Ill. State Police*, 29 F.4th 887, 891 (7th Cir. 2022) (citing *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)). If the plaintiff succeeds, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for its actions. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014) (quoting *Petts v. Rockledge Furniture, LLC*, 534 F.3d 715, 725 (7th Cir. 2008)). Once the employer has done so, the burden returns to the plaintiff to show that the proffered explanation is pretextual. *Id.* (citing *Contreras v. Suncast Corp.*, 237 F.3d 756, 760 (7th Cir. 2001)).

### A. Correa Has Successfully Presented a Prima Facie Case of Discrimination.

The parties do not dispute that Correa has established a prime facie case on the first and third elements of a Section 1981 claim. Correa is Afro-Puerto Rican and thus part of a protected class. (*See* ECF No. 10 ¶1; ECF No. 35 at 9.) And Elite terminated Correa's employment, which is unquestionably an adverse employment action. *See Alexander*, 739 F.3d at 980 ("Adverse employment actions 'generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment….") (quoting *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011)).

Whether Correa has shown the other two elements is more complicated. To conform to a company's legitimate expectations is to say the employee was "performing his job satisfactorily." *Denisi v. Dominick's Finer Foods, Inc.*, 99 F.3d 860, 864 (7th Cir. 1996); *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997). *See also Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 328 (7th Cir. 2002) (finding employee failed to meet employer's legitimate expectations with evidence of her deteriorating job performance in the 18 months leading up to her termination).

It is undisputed that Correa was leaving work early in violation of Elite's policy. If this were the extent of the record, Elite would be entitled to summary judgment. But there is more. Both Hasan and Lopez admitted they were not planning on terminating Correa at the March 22 meeting. (ECF No. 36 ¶14; ECF No. 38 ¶11.) They further admit that Maliszewski only decided to terminate Correa *after* they reported to him their account of that meeting and Correa's reaction to being disciplined. (ECF No. 37 ¶8.) Indeed, Elite's witnesses confirm that Correa was ultimately terminated not because of his failure to comply with the company's policies, but for his actions at the disciplinary meeting. These admissions are enough for Correa to make out a prima facie case that he was meeting the company's expectations.

While Correa's conduct at the meeting might also be deemed unsatisfactory, the events at that meeting are hotly disputed. If Correa reacted to being disciplined as Lopez claims, that reaction could be reasonably interpreted to mean that he was not satisfying Elite's legitimate expectations. But Correa disputes this account. He maintains he was not angry but rather "offended" and then raised the specter of discrimination. (ECF No. 38 ¶18; ECF No. 41 at 45.) If his version of the events is credited, a jury could find that he was meeting Elite's expectations and fired for much different reasons. Accordingly, Correa has enough evidence to support a prima facie case on this third element.

The final element asks whether the employer treated the plaintiff differently than other similarly situated employees. Similarly situated employees must be "'directly comparable' to the plaintiff 'in all material respects,'" though they "need not be identical in every conceivable way." *Reives*, 29 F.4th at 892 (quoting *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012)). "The purpose of the similarly situated prong is to 'eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *Coleman*, 667 F.3d at 846)). Typically, a plaintiff must show that its comparators "(1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman*, 667 F.3d at 847 (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). At the same time, the burden to establish a prima-facie case is not meant to be rigid nor onerous, and "precise equivalence…between employees is not the ultimate question." *Id.* at 846 (quoting *McDonald v. Santa Fe Trial Trans. Co.*, 427 U.S. 273, 283 n.11 (1976)). The similarly-situated inquiry is a flexible one, *see Reives*, 29 F.4th at 892; and its nature means it is typically left for the factfinder. *Coleman*, 667 F.3d at 841, 846.

Correa has proffered enough evidence that Gonzalez and Orosco were similarly situated employees who were subject to the same policies or adverse actions as Correa as required by *Coleman*. 667 F.3d at 846; (*see* ECF No. 45 at 9–10). While Correa's direct supervisor was Cervera, (ECF No. 34 ¶10), Lopez was Cervera's direct supervisor, and Lopez supervised all employees at the plant regardless of shift. (*Id.*; ECF No. 40 at 10.) And all three employees' timecards have Lopez's initials, suggesting Lopez is the ultimate decisionmaker for counting

hours.  (*See* ECF Nos. 36-5 & 36-8.)  Lopez supervised all employees in the plant, including those on the second shift like Correa.  (ECF No. 40 at 10.)  The three employees were also subject to the same standards of conduct: Elite's equal employment opportunity policy, harassment policy, retaliation policy, time-card policy, and "shop rules."  (ECF No. 34 ¶¶4–6.)  Finally, all three employees engaged in similar conduct by leaving early without supervisor permission, and Orosco even sometimes failed to complete all of his duties, like Correa.  (ECF No. 51 ¶¶12–13.)  Correa has thus offered enough evidence to show that Orosco and Gonzalez are appropriate comparators and a prima facie case of employment discrimination.  *C.f. Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (holding the plaintiff failed to meet burden of proof on similarly situated prong when she made "no attempt to point" to another employee without the protected classification who received more favorable treatment); *Arizanovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 703 (7th Cir. 2012) (noting the plaintiff did "not identif[y] a similarly-situated employee *outside* her protected class," thus dooming her discrimination claim); *McDaniel v. Progress Rail Locomotive*, *Inc.*, 940 F.3d 360, 369 (7th Cir. 2019) (finding plaintiff failed to provide any information that would allow a finder of fact to determine the individuals are similarly situated because plaintiff provided no evidence of "the employees' names, work history, performance reviews, or—most importantly—their [protected class]").

### B. Elite Has Likewise Shown Legitimate Reasons for Correa's Termination.

Under the *McDonnell Douglas* framework, the burden now shifts from Correa to Elite to articulate a legitimate, nondiscriminatory reason for terminating Correa.  *See Reives*, 29 F.4th at 891 (citing *Simpson*, 827 F.3d at 661).  For its part, Elite argues that Correa's termination was the result of his unsatisfactory job performance, including leaving work early without permission, failing to clock in and out when leaving in the middle of his shift, and his poor response when confronted with these issues.  (ECF No. 35 at 9, 13.)  In particular, Elite cites Correa's lack of ownership of his deficiencies and his critical position at Elite raised concerns of whether a "disgruntled employee" like Correa would cause harm to the company or the general public.  (*See* ECF No. 46 at 11; ECF No. 45-2 at 3; ECF No. 43 at 26–27.)  This is a sufficient articulation of a legitimate reason for Correa's firing and it therefore shifts the burden back to Correa to offer evidence that this proffered reason is mere pretext.

### C. A Reasonable Factfinder Could Conclude Elite's Reasons for Correa's Termination Were Pretextual.

Pretextual reasons are "'phony reason[s]' that the employer offers for engaging in discriminatory conduct." *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 845 (7th Cir. 1996). "A plaintiff can prove that an employer's proffered reasons for an employment decision are pretextual by one of two methods: (1) by showing that a discriminatory reason more likely than not motivated the employer … or (2) that the employer's proffered explanation is unworthy of credence." *Kralman v. Ill. Dep't of Veterans' Affs.*, 23 F.3d 150, 156 (7th Cir. 1994). For example, if an employer "gives a reason for its decision that is unrelated" to the protected class at issue, "the plaintiff must present evidence that the real reason was [his or her protected class] or that the stated reason is unworthy of belief—a mere pretext, possibly of discrimination." *Id.* (quoting *Konowitz v. Schnadig Corp.*, 965 F.2d 230, 232–33 (7th Cir. 1992)).

Correa contends that Elite's proffered reasons for his termination are pretextual. He argues that Lopez's routine racially derogatory comments make clear he was fired due to his race and ethnicity, and not his supposed job performance. (*See* ECF No. 45-4 ¶¶17, 38.) Additionally, the differing accounts of the March 22 meeting could suggest that Hasan found pretextual reasons to terminate Correa's employment by categorizing his demeanor at the meeting as angry. (*Id.* ¶31.) He also points out that his termination letter is silent concerning his attitude at the meeting. (ECF No. 36-7 at 1.) Finally, because Hasan and Lopez allowed other, similar employees to leave early without termination, Correa argues that his firing for this conduct was pretextual. (ECF No. 45 at 10.)

Correa has come forward with sufficient evidence to create a jury issue on pretext. The combined evidence of Correa's sworn statements concerning Lopez's racially derogatory comments, Correa's version of the March 22 meeting, and the arguable inconsistency between Elite's treatment of Correa and his co-employees is sufficient to create a genuine dispute over whether Maliszewski's reasons for Correa's termination were pretextual. (*See* ECF No. 45-4 ¶¶17, 38.) To be clear, the derogatory comments alone might not be enough to find Maliszewski's reasons for his termination pretextual. *See Brummett v. Lee Enters., Inc.*, 284 F.3d 742, 745 n.1 (7th Cir. 2002) ("It is not enough that [Plaintiff] is African American, was disliked, and was fired; he must prevent some evidence…that he was fired because of his race."). But when combined with the possibility that Hasan applied the supervisor-permission policy unevenly based on an

employee's race or ethnicity, Correa's contention that Lopez made racially discriminatory comments creates a genuine factual dispute. *See Peele*, 288 F.3d at 329.

Correa's claims largely rest on the credibility of each side's recitation of the events at the disputed meeting and there are good reasons to question his version of events.[3] But the Court does not make credibility determinations at summary judgment. As a result, Correa has provided enough evidence that but for his race, ethnicity, and nationality, Elite would not have terminated Correa's employment. *See Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) ("The purpose of the similarly situated prong is to 'eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus.'") (citing *Coleman*, 667 F.3d at 846). Elite's motion for summary judgment on the employment discrimination claim must therefore be denied.

## II. Correa's Retaliation Claim Likewise Survives Summary Judgment.

Correa also argues that Elite retaliated against him for engaging in protected conduct in violation of section 1981. (ECF No. 13 ¶1.) Section 1981 retaliation claims are generally subject to the same prima facie requirements brought under Title VII and section 1981. *See Humphries v. CBOS West, Inc.*, 474 F.3d 387, 402–04 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). To survive summary judgment on a retaliation claim, Correa "must establish that (1) he engaged in a protected activity; (2) he suffered an adverse employment action;" and either "(3) there is a causal link between the protected activity and the adverse action," or (4) "that he was performing his job satisfactorily and that he was treated less favorably than a similarly situated employee who did not complain of discrimination." *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (citing *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 693 (7th Cir. 2014)); *Stephens v. Erickson*, 569 F.3d 779, 786–87 (7th Cir. 2009) (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir.

---

[3] Elite argues that because Correa has not produced the entire phone recording of the meeting that captures Lopez's racially discriminatory language, the Court is required to draw a negative inference regarding the recording. (ECF No. 46 at 6.) In the Seventh Circuit, a negative inference may arise when "a party intentionally destroys documents in bad faith." *Reed v. Freedom Mortgage Corp.*, 869 F.3d 543, 549 (7th Cir. 2017). Whether Correa intentionally destroyed the recording is a question of his credibility, which is a determination for the trier of fact. Additionally, on Elite's motion for summary judgment, the Court must interpret the facts in a light most favorable to Correa. *See Sears, Roebuck & Co.*, 233 F.3d at 437. Therefore, the Court will not draw a negative inference regarding the phone recording for the purposes of summary judgment. But the Court reserves the right to give the jury such an instruction in weighing the evidence at trial.

2008)). Again, Correa unquestionably meets the second element because termination is an adverse action. *See Lauth*, 863 F.3d at 717.

For the first requirement, a protected complaint must show that its substance "implicate[s] [the plaintiff's] alleged protected class." *McHale v. McDonough*, 41 F.4th 866, 872 (7th Cir. 2022). Correa claims he complained about Lopez's use of slurs and discriminatory treatment on and before the March 22 meeting. (*See* ECF No. 45 at 12.) Although disputed, if this claim is true, he engaged in protected activity. *See Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) ("[T]he employer must have had actual knowledge of the protected activity in order for its decisions to be retaliatory; it is not sufficient that '[an employer] could or even should have known about [an employee's] complaint.'") (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 668 (7th Cir. 2006)). It is true that an amorphous complaint that implies race discrimination is not enough to constitute a protected activity. *See Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 901 (7th Cir. 2016); *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007) ("[T]iming alone is insufficient to establish a genuine issue of material fact to support a retaliation claim."). But Correa's complaints are not amorphous in this sense—he asserts he complained of Lopez's discriminatory remarks specifically at the March 22 meeting, and the alleged comments certainly implicate his protected class as a Black Puerto-Rican.

As to the third element, Correa has evidence sufficient to show a causal link between his complaints about Lopez's racially derogatory language and his termination. Correa complained about Lopez's remarks at the March 22 meeting, and Elite's management used this meeting as the basis of his termination. Of course, often timing alone is insufficient to prove a causal link. *See Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 473 (7th Cir. 2018) (finding temporal proximity with no other evidence not enough to show causal proximity for direct method of proof). Even suspicious timing coupled with other evidence to infer a causal link can still trend towards "impermissible speculation," because a plaintiff needs to "provide more than his mere assertions to defeat summary judgment, especially when … poor performance provide[s] [the employer] with a nondiscriminatory rationale for his termination." *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021). But here, Hasan and Lopez agree that Correa was not going to be fired prior to the March 22 meeting. It was only based on their reports of that meeting that Maliszewski decided to fire Correa. Accordingly, while the parties dispute exactly what happened

at the meeting, there is no question that whatever took place led to Correa's termination. That is sufficient to provide a causal link.

Even if Correa had not met the third element, he has evidence sufficient to show the alternative fourth element. As discussed above, Hasan did not plan on firing Correa prior to the March 22 meeting, meaning Correa was performing his job satisfactorily before March 22. And Orosco and Gonzalez were similarly-situated employees who, like Correa, left work early; but unlike Correa, never complained about racial discrimination to Elite's supervisors. Because Orosco and Gonzalez were not terminated for the same behavior, Correa has offered enough evidence to show that he was retaliated against for engaging in a protected activity.

Elite's motion for summary judgment on Correa's retaliation claim must therefore be denied.

## CONCLUSION

For the reasons given above,

**IT IS HEREBY ORDERED** that Elite's motion for summary judgment, ECF No. 33, is **DENIED.**

Dated at Milwaukee, Wisconsin on January 11, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge